## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DOUGLAS MANLEY,         )
                        )
                Plaintiff,    )
                        )
vs.                      )
                        )
WEXFORD HEALTH SOURCES, INC.,  )
PHIL MARTIN,          )
TERRI EVANS,          )
KIMBERLY STEPHENS,     )
TERESA GLENDENNING,    )     Case No. 23-cv-3146-DWD
PENNY ECKEL,          )
RENAE SWITZER,        )
SADIEL DOPASO,        )
ANASTACIA GOIN,      )
MARIAH WELCH STEADMAN,   )
SEAN RICE,           )
CALEB J. MASON,       )
WARDEN OF ROBINSON,    )
                        )
             Defendants.  )

## <u>MEMORANDUM AND ORDER</u>

**DUGAN, District Judge:**

Plaintiff Douglas Manley, a former inmate of the Illinois Department of Corrections (IDOC) brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Robinson Correctional Center. Plaintiff applied for in forma pauperis status, so his complaint was reviewed under 28 U.S.C. § 1915(e), and he was allowed to proceed on three claims. (Doc. 9). Many defendants have now filed for summary judgment, via three separate motions. (Docs. 69, 80, 103). The defendants can be viewed in groups by their employer: Evans, Stephens, Glendenning, and Eckel are/were Wexford employees (Docs. 69, 71); Steadman, Rice, Mason, and

Martin are/were IDOC employees (Docs. 80, 81); and Switzer has not been identified explicitly with either group and appeared and filed documents via her own counsel in this case (Docs. 103, 104). Plaintiff has responded, and the motions are ripe for consideration. For reasons explained in this Order, the Court finds that all movants are entitled to summary judgment. This leaves just Claim 1 in this case against Defendants Goin and Dopaso, who have not yet successfully been served.

### PROCEDURAL HISTORY

Plaintiff initiated this case by filing a complaint on September 11, 2023, which was received by the Court for filing on September 18, 2023. (Doc. 1 at 58). Upon initial review, the Court designated the following three claims to proceed in the instant case:

| Claim 1: | Eighth Amendment deliberate indifference claim against medical providers (Defendants Martin, Evans, Stephens, Glendenning, Eckel, Switzer, Goin, and Dopaso) who refused or delayed catheters or catheter supplies; |
|---|---|
| Claim 2: | Eighth Amendment deliberate indifference claim against Defendant Rice for their involvement in denying catheters; and |
| Claim 5: | First Amendment retaliation claims against Defendants Steadman, Mason, Stephens, and Glendenning for their alleged actions taken in retaliation for Plaintiff's verbal or written requests for care. |

(Doc. 9 at 26-27).[1] On March 20, 2024, the Court issued a scheduling order allowing the parties to proceed to merits discovery. (Doc. 38). The discovery deadline was set as January 20, 2025, and dispositive motions were due by February 19, 2025. (*Id.*). The scheduling order also indicated that if Plaintiff wished to file an amended pleading, he

---

[1] Other claims and parties were dismissed, and a seventh claim was severed into a separate case concerning Plaintiff's dental care needs at Robinson, *Manley v. Tran*, Case No. 23-cv-3982-DWD.

should do so by May 20, 2024, and that "failure to file a motion for leave to amend by this date will likely bar further amendment of the complaint[.]"  (Doc. 38 at 3).  The scheduling order also discussed the basic parameters of discovery, and instructed that if needed, a party could file a motion to compel discovery under Federal Rule of Civil Procedure 37. (Doc. 38 at 5).

As discovery commenced, the Court also continued efforts to serve defendants for whom there had been difficulty locating service addresses.  These efforts included adding the Warden to the case and also seeking service information from Wexford Health Services (the medical contractor for the prison during the relevant timeframe).  Through these efforts, Plaintiff was able to discern full and proper names for Defendants Renae Switzer, Anastacia Goin, and Sadiel Dopaso.  (Doc. 52).  The Court successfully served Switzer.  (Docs. 55, 56).  It also continued efforts to identify and serve Goin and Dopaso (Docs. 58, 91, 98), including issuing summons via the United States Marshals service as recently as July of 2025.  (Doc. 100).

Meanwhile, on October 15, 2024, Defendant Switzer moved to dismiss the claim against her (Doc. 60), and on April 15, 2025, Plaintiff moved for leave to file an amended complaint (Doc. 83).  The Court denied the motion to dismiss, indicating that at that early juncture in the case, a liberal reading of the facts supported the claim against Switzer. (Doc. 93 at 2-5).  The Court also denied Plaintiff's Motion for Leave to Amend because it was months beyond the deadline to amend and months beyond the February 2025 merits summary judgment deadline.  (Doc. 93).  The proposed amended pleading did not comply with the Local Rules and instead relied upon piecemeal modifications buried in

hundreds of pages of materials, and the length, complexity, and delay of the pleading
would unduly prejudice the existing defendants.  (Doc. 93).  In the same order denying
the Motion to Dismiss and Motion to Amend, the Court also struck summary judgment
pleadings by Defendant Switzer and Plaintiff that did not comply with Local Rule 56.1,
and it afforded the parties additional time and guidance on how to file new compliant
pleadings.  (Docs. 93, 94).

On February 19, 2025, Defendants Evans, Stephens, Glendenning and Eckel, filed
their Motion for Summary Judgment (Doc. 69) and supporting memorandum (Doc. 71).
After his initial response was stricken for failure to comply with the Local Rules, Plaintiff
filed a response on August 25, 2025 (Doc. 112), and on August 28, 2025, he supplemented
with the filing of a disk containing exhibits (Doc. 113).  The disk will be cited throughout
this pleading as "Pltf. CD re Doc. 69."  The disk contains numerous JPEG photographs of
records,[2] Word documents containing various general medical and legal information,[3]
and some PDF files.  At the end of this order, a table has been included summarizing the
exhibits that were contained on the CD.

On March 12, 2025, Defendants Steadman, Rice, Mason, and Martin moved for
summary judgment and filed a supporting memorandum.  (Docs. 80, 81).  Plaintiff
responded (Docs. 109, 111) and submitted another disk (Doc. 113).  The disk will be cited

---

[2] The JPEGs contain pictures of Plaintiff's various records such as but not limited to: grievance documents
(Exhibits 1-10), his visits to the nightly nurse treatment supply line (Exhibits 13-20), his medical call passes
(Exhibits 11, pages 1-16), nursing progress notes (Exhibits 21-22),  and copies of handwritten calendar that
he maintained as a personal journal (Exhibit 78).  (Pltf. CD re Doc. 69).
[3] For example, Exhibits 23 to 29 are Word documents containing various Illinois statutes on nursing and
negligence, Exhibits 46-48 are Word documents that contain copies of alleged blog posts about self-
catheterization, and exhibits 40-44 are PDF documents containing Administrative Directives about various
topics.  (Pltf. CD re Doc. 69).

throughout this Order as "Pltf. CD re Doc. 81." The disk contains many of the same sorts of documents to the CD described in footnotes 2 and 3, and the Court reviewed these exhibits when reviewing the claims for Defendants Steadman, Rice, Mason, and Martin. The table at the end of the Order catalogues the exhibits.

Finally, on July 30, 2025, Defendant Switzer re-submitted a properly formatted motion for summary judgment and memorandum. (Docs. 103, 104). Plaintiff responded and submitted a third disk of exhibits. (Doc. 115). The disk will be cited in this Order as "Pltf. CD re Doc. 104." Again, this CD contains exhibits similar to the other two CDs and the exhibits were reviewed as cited by Plaintiff. The table at the end of the Order catalogues the exhibits.

The IDOC Defendants (Doc. 114) and the Wexford Defendants (Doc. 116) have both sought extensions of time to file reply briefs. Reply briefs are disfavored by Local Rule 7.1(a)(4), and the Court did not find them necessary to address the pending motions in this case, so Defendants' motions are denied. Defendant Switzer filed a reply brief, which does not substantially alter her earlier arguments and does not incorporate any new evidence. (Doc. 117).

FACTS

This case concerns Plaintiff's medical needs while incarcerated at Robinson from February 25, 2022, through May 26, 2023. (Pltf. Dep., Doc. 71-8 at p. 20:17-18, 20:25-21:2, 21:5). Specifically, prior to entering prison Plaintiff was diagnosed with a collapsed bladder, a condition which requires him to self-catheterize to release urine. (Pltf. Dep.,

Doc. 71-8[4] at p. 73:3-24; Pltf. CD re Doc. 69, Exh. 69 pp. 1-4 (original diagnosis documents)). He was advised prior to entering prison that he should self-catheterize 3-4 times per day. (*Id.*; 118:10-14; Pltf. CD re Doc. 69, Exh. 69 p. 3). Plaintiff entered IDOC at Stateville Correctional Center's Reception and Classification Center. (Pltf. Dep., Doc. 71-8 at p. 20:12-15, 17-18). At Stateville, he was provided a large quantity of catheters, some of which he took with him to Robinson. (Pltf. Dep., Doc. 71-8 at p. 84:10-20). Upon arrival at Robinson, he began to regularly receive catheters and related supplies (gloves, lubricant, wipes, etc.), in smaller but more frequent quantities. (Pltf. Dep., Doc. 71-8 at p. 86:15-87:1). He received a call pass every single day to attend nurse treatment line for supplies, but opted to only attend occasionally, when he felt he needed more supplies. (Pltf. Dep., Doc. 71-8 at p. 87:2-6; 92:9-19).

Nurses Stephens, Glendenning, and Eckel averred in their declarations that they were nurses at Robinson during the time relevant to this case. (Stephens Decl., Doc. 71-2 at ¶ 1; Eckel Decl., Doc. 71-3 at ¶ 2; Glendenning Decl., Doc. 71-4 at ¶ 1). Individuals could access care via sick call each day, or by making a request to the nearest employee for emergency care 24/7. (Stephens Decl., Doc. 71-2 at ¶¶2-8; Eckel Decl., Doc. 71-3 at ¶¶3-9; Glendenning Decl., Doc. 71-4 at ¶¶2-8). Individuals with daily needs, like the issuance of medical supplies, also accessed care via the nurse treatment line, which began at 6:00p.m. each night. (Stephens Decl., Doc. 71-2 at ¶¶10-12; Eckel Decl., Doc. 71-3 at ¶¶ 11-12; Glendenning Decl., Doc. 71-4 at ¶¶10-12). Each of these nurses attested that

---

[4] All three motions for summary judgment included full copies of Plaintiff's deposition, but for ease of understanding, the Court will only cite the copy included with the first motion filed. The depositions are at Docs. 71-8, 81-1, and 104-1.

individuals at Robinson who need catheters to drain urine are required to return used catheters to nurse treatment line each time they seek new catheters. (Stephens Decl., Doc. 71-2 at ¶¶17-18; Eckel Decl., Doc. 71-3 at ¶¶16-17; Glendenning Decl., Doc. 71-4 at ¶¶17-18). All three nurses attested that they never denied Plaintiff a catheter while believing he had an urgent need to urinate, that if he presented in such a state they would have evaluated him and offered immediate relief, and that if he found himself in a position at the facility at any time needing a catheter and not having one, he could have asked the nearest employee for assistance. (Stephens Decl., Doc. 71-2 at ¶¶ 23-24, 55; Eckel Decl., Doc. 71-3 at ¶¶25-29, 31, 33; Glendenning Decl., Doc. 71-4 at ¶¶31, 33-38, 54-59, 62).

The nurses do not order supplies for the prison and were not authorized to procure medical supplies from outside sources. (Stephens Decl., Doc. 71-2 at ¶¶ 13-14; Eckel Decl., Doc. 71-3 at ¶¶ 13-14; Glendenning Decl., Doc. 71-4 at ¶¶ 13-14). Defendant Evans, who severed as the Director of Nursing from February of 2022 through August of 2022, was responsible for ordering medical supplies. (Evans Decl., Doc. 71-1 at ¶¶ 1, 33). She explained that due to limited storage space, she tried to order supplies in a timely fashion to meet demand without overcrowding the available space. (Evans Decl., Doc. 71-1 at ¶¶ 34-35). She did not know in March of 2022 that there would be a shortage of French 14 catheters or that in May of 2022 there would be a shortage of lubricant. (Evans Decl., Doc. 71-1 at ¶¶ 36, 39-40). When she learned of the catheter shortage, she immediately visited one of the two sources where she was authorized to get back-up supplies and brought them back to the prison for Plaintiff's use. (Evans Decl., Doc. 71-1 at ¶¶ 24-30). She did not learn of the lubricant issue until May 20, 2022, after it had been resolved. (Evans

Decl., Doc. 71-1 at ¶¶ 38-40). Evans never intentionally failed to order adequate supplies, nor were there routine issues with receiving adequate supplies. (Evans Decl., Doc. 71-1 at ¶¶ 37, 41). Defendant Martin, the healthcare administrator at Robinson, averred that if the Director of Nursing was not on site, the Wexford Regional Administrator was responsible for ordering supplies. (Martin Decl., Doc. 81-3 at ¶ 6). Martin did not personally order supplies. (Martin Decl., Doc. 81-3 at ¶ 7).

As to the catheter exchange policy, Evans averred that there are a number of reasons for the requirement, such as: to ensure proper disposal of used catheters, to promote single uses, to prevent hoarding, and prevent misuse which could be a security risk, and to see if a patient is complying with a doctor's recommendations. (Evans Decl., Doc. 71-1 at ¶¶ 10-12). Martin attested that he did not have a say in the catheter return policy, in so much as he did not instruct it, nor could he tell nurses what they should withhold or provide. (Martin Decl., Doc. 81-3 at ¶ 9). Martin witnessed a conversation between the Warden and Plaintiff where Plaintiff requested an alternative method for catheter disposal and Dodd explained that the exchange process is a safety issue and the placement of the disposal box he asked for could be a safety issue. (Martin Decl., Doc. 81-3 at ¶¶ 13-14).

Plaintiff testified at length at his deposition about the catheter exchange rule. He testified that he first heard of the rule in March of 2022. (Pltf. Dep., Doc. 71-8 at 141:5-6). He testified that sometimes he would follow the rule to avoid conflict with the nurses and other times he would refuse to follow it because he felt it was hazardous or gross, he got complaints from fellow inmates, and he did not believe the rule was properly

documented. (Pltf. Dep., Doc. 71-8 at 45:4-46:17; 141:20-153). Medical records show that sometimes Plaintiff would exchange catheters, and other times he would refuse. On multiple occasions in July of 2022 while he resided in the infirmary, staff explained the rule to him and documented their efforts and rationale in the medical chart. *See e.g.,* (Doc. 71-5 at 85-88). While in the infirmary and after extensive conversations about the rule, it was documented that Plaintiff made exchanges. *See e.g.,* (Doc. 71-5 at 91). Defendant Martin also documented that he sat down with Plaintiff and attempted to discuss the exchange system on October 18, 2022, but Plaintiff became aggressive and argumentative with him. (Doc. 71-5 at 136-38). In September of 2022 and January of 2023, nurses documented that Plaintiff was angry or hostile with them about the catheter exchange issue. (Doc. 71-5 at , 118-19, 160-61).

The records from nightly nurse treatment line were submitted by the Wexford Defendants (Doc. 71-5 at 283, 288-90, 295-300) and repeatedly by Plaintiff (Pltf. CD re Doc. 69, Exh. 13-20; Pltf. CD re Doc. 81, Exh. 14-20; Pltf. CD re Doc. 104, Exh. 5). The records generally reflect that Plaintiff received catheters and other supplies on numerous occasions. Specific dates will be discussed as needed in the analysis portion of this Order. The Wexford Defendants also included Plaintiff's offender outpatient progress notes from his entire time at Robinson, including records from a trip to an outside hospital for cellulitis and a stay in the prison's infirmary. (Doc. 71-5 at 22-176; *see also* Pltf. CD re Doc. 69, Exh. 21-22; Pltf. CD re Doc. 81, Exh. 21-22). Again, these records will be discussed when pertinent in the analysis. The Wexford Defendants also included other miscellaneous medical records such as mental health records, dental records, various

vaccine and lab results, and various inmate refusal forms.  (Doc. 71-5 at 301-404).  The
Wexford Defendants and Plaintiff included copies of various grievances and disciplinary
documents.  (Doc. 71-5 at 404-506).  The IDOC Defendants included Plaintiff's deposition,
his cumulative counseling summary (Doc. 81-2), and their own affidavits (Doc. 81-3-81-
6).  Defendant Switzer included the full deposition and her timecard (Doc. 104-2).

The Court will not recite the facts contained in these numerous documents at
length in this section, because it will be easier for the reader to follow the evidence and
for the Court to adequately assess the evidence if it is set forth directly with the analysis
for the various Defendants and claims.  However, the Court provides this brief high-level
summation to paint the picture of what will be discussed:

From February 25, 2022, through May 26, 2023, there are ultimately three instances
when Plaintiff alleges that issues with access to supplies completely prevented him from
releasing urine for an extended duration.  First, he alleges that from Friday, March 25,
2022, during the evening treatment line until Monday, March 28, 2022, he experienced a
lapse in catheter supplies.  He was documented as receiving supplies on March 21, 2022.
When he returned for new supplies on Friday, March 25, he was informed that no French
14 catheters were available.  He advised the nurse that he *may* have enough to last the
weekend and indicated he would check back over the weekend if needed.  Plaintiff
alleges by reference to a grievance that he checked back on March 26 and March 27, and
advised during the March 27 check-in that he was entirely out of catheters and had run
out in the morning.  (Pltf. CD re Doc. 69, Exh. 1 pp. 1-2).  He claims he was told at that
time to wash and re-use a catheter.

On March 28, 2022, Plaintiff was seen on sick call in the morning and reported the lack of catheters and inability to urinate since Sunday, March 27 in the morning. Defendant Evans left the prison within 30 minutes and returned with a supply of 10 catheters, which were then disbursed to Plaintiff over the course of the week. Plaintiff alleges he was in severe pain by the morning of March 28, though he identifies no lasting injury or infection. Nurse Evans averred that she was responsible for ordering supplies, and she did not know about the shortage until she was notified on March 28. She was the only person allowed to get supplies and could only go to specific sources. Nurses Glendenning, Eckel, and Stephens attested that they did not have authority to procure supplies, but that if they learned of a shortage, they would have contacted a doctor for immediate instructions on how to proceed.

Second, Plaintiff alleges that on May 16, 2022, the medical unit ran out of the lubricant needed for catheterization and he was instead provided with antibiotic ointment packets. He alleges this shortage prevented him from urinating until he received replacement supplies on May 18, 2022. As with the first incident, Evans attested she had no knowledge of the supply issue.

Third, Plaintiff alleges that during a short stay in segregation he failed to catheterize on the evening of June 2, and then Defendant Rice refused to provide his supplies to catheterize on June 3, 2022, until mid-afternoon when he was released from segregation.

Aside from the three incidents detailed above, there are numerous other occasions when Plaintiff alleges that he was refused supplies due to various prison employees'

insistence that he follow a rule about exchanging used catheters for new catheters.
Plaintiff testified at his deposition that he sometimes complied with the rule to avoid
strife with the nurses, and other times he refused because he did not like the rule, felt the
rule brought him problems in his housing unit, and did not feel the rule was enforceable
without being memorialized in the prison orientation manual.  He also indicated that the
rule was not universally enforced, meaning that sometimes he would be allowed new
supplies without any mention of an exchange, and other times the exchange issue would
arise.

In addition to supply issues, Plaintiff also alleged instances of retaliation in his
complaint.  The instances discussed are: August 28, 2022, and December 1, 2022, with
Defendant Stephens; September 27, 2022 with Defendant Glendenning; and, November
27, 2022 with Defendants Mason and Steadman.  With Stephens and Glendenning, the
incidents are related to Plaintiff's allegation that they denied him catheter supplies in a
retaliatory fashion.  As to Mason and Steadman, he alleges they implicated him in a
disciplinary issue in retaliation for a grievance.

## CONCLUSIONS OF LAW

A. Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact
and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In
determining a summary judgment motion, the Court views the facts in the light most
favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex
Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

Courts generally cannot resolve factual disputes on a motion for summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). However, a non-movant must do more than rest upon the allegations made in the complaint to withstand summary judgment. *See e.g., Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("[T]o withstand summary judgment, the non-movant ... may not rely on vague, conclusory allegations."); *see also, Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion.").

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750; *accord, Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second consideration is if the prisoner has demonstrated subjective indifference to his situation.

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference.

*Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (*citing Gayton, 593 F.3d at 620*).

In addition to refusing treatment or providing treatment that is inadequate, a prison medical provider may also be liable for deliberate indifference based on allegations that they needlessly delayed treatment. To demonstrate that a delay caused a cognizable injury, an inmate must show that the delay either exacerbated his injury *or* that it unnecessarily prolonged the pain. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir. 2021). In cases where prison officials delayed rather than denied treatment, the plaintiff must offer verifying medical evidence that the delay (rather than the underlying condition) caused some degree of harm. *Id.* at 749, *citing Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).

## B. Analysis

Preliminarily, the Court notes that Plaintiff's amended responses to the summary judgment pleadings still do not fully conform with Local Rule 56.1. The Court recognizes that Plaintiff is a pro se litigant, and that he made a genuine effort to follow the rule, but his effort is still imperfect. For example, with the Wexford Defendants' Motion (Docs. 69, 71), rather than responding to the Memorandum in Support of Summary Judgment (Doc. 71), which contained the statement of material facts, Plaintiff instead responded to just the motion itself (Doc. 69), which contained only a high-level summary of Defendants' arguments. In doing so, Plaintiff attempted to use the admit/deny format set forth in the Court's Notice (Doc. 94). However, rather than include his own separate statement of

facts, Plaintiff would do things like admit a fact but then significantly elaborate with his own additional facts (Doc. 112 at p. 4, ¶ 8).[5]  Additionally, Plaintiff disputed propositions about if summary judgment should be granted for a defendant by including multiple paragraphs of his own that cited his exhibits without thoroughly explaining what the exhibits contained.  (Doc. 112 at p. 6).  In some instances, Plaintiff also made conclusory statements in his responses without citing supporting evidence.[6]  Though the Court may not discuss every single piece of evidence in great detail, it did thoroughly review all materials submitted by all parties in the drafting of this Order.

### Claims 1-2: Deliberate indifference re catheter supplies

As other Courts have done with the issue of catheterization, the Court assumes for purposes of this Order that Plaintiff's need for self-catheterization to urinate based on his collapsed bladder is an objectively serious medical condition.  *See e.g.*, *Stewart v. Wall*, 688 Fed. App'x 390, 393 (7th Cir. 2017) (assuming that a diagnosed neurogenic bladder issue that required catheterization was a serious medical need); *Newell v. Ngu*, 589 Fed. App'x 782, 786 (7th Cir. 2014) (treating bladder condition that required monthly catheter changes as objectively serious at summary judgment).  Plaintiff has provided proof that this medical condition was diagnosed prior to his entry to prison, and there is no evidence

---

[5] For example, he admitted that Defendant Stephens refused to give him catheters on August 25, 2022, for exchange, but then went on to elaborate that "Stephens knew treatment line would not occur for another 24 hours then refusing me catheters. Fortunately, I signed up and attended sick call August 26, at 8:00a.m. where I received catheters from Nurse Ikanyan without exchange." (Doc. 112 at p 4 ¶ 8).  This is just one small example of the way that Plaintiff interwove his own version of the facts throughout all three responses to the summary judgment motions.

[6] For example, in response to Mason and Steadman's motion for summary judgment, Plaintiff wrote several multi-sentence paragraphs describing his version of events in narrative form without clear citations to evidence.  (Doc. 111 at pp. 19-20, ¶¶ 51-52).  To the extent that he cited his exhibits in these longer format narrative statements, it was not apparent how the evidence supported what he wrote.

that the initial diagnosis was incorrect or that Plaintiff's condition changed during his incarceration. The parties are also in agreement that appropriate treatment for Plaintiff included daily self-catheterization 3-4 times per day.

Thus, the issue in this case turns on the second prong of deliberate indifference, if the Defendants exhibited subjective disregard for Plaintiff's needs. The parties agree that Plaintiff's standard plan of care for his bladder condition involved using a catheter 3-4 times per day, and that he had a standing daily call pass for nurse treatment line at 6p.m. each evening to procure supplies. Nurse treatment line was meant solely to distribute medical supplies. If an inmate needed any other sort of care, he was to sign up for nurse sick call. Plaintiff described sick call as something he had a responsibility to sign up for on his own. Many of the Defendants averred that Plaintiff also could have sought care at any time at Robinson by alerting any prison employee to his need for care, which could then be reported up the chain to be triaged by a person with appropriate authority. Plaintiff does not provide any evidence whatsoever that he was unable to use this process, and in fact, he hardly suggests he ever even tried to use this process.[7]

The Court will now discuss and analyze the three discrete instances it highlighted in the fact section when Plaintiff claims he was entirely without access to catheter supplies. These instances encompass Claims 1 and 2 concerning deliberate indifference

---

[7] In fact, in the Complaint, Plaintiff mentioned that in January and February of 2023, he experienced two instances where he thought he was going to run out of catheter supplies, but he reported this to prison staff, and they were able to drive to Lawrence Correctional Center to secure supplies on those two occasions. (Doc. 1 at ¶¶ 434-438).

to Plaintiff's ability to access catheters by Defendants Evans, Stephens, Glendenning, Eckel, Switzer, Martin, and Rice.

Beginning with the initial catheter supply incident between March 25, 2022 and March 28, 2022, Plaintiff alleged in his complaint that on March 21, 2022, he attended treatment line to receive catheters, at which time Defendant Goin told him that she had enough catheters to give him that day, but that the supply was otherwise depleted and the Director of Nursing (Defendant Evans) would need to order more. (Doc. 1 at ¶ 236). He alleges that when he attended treatment line on March 25, 2025, Goin told him they were out because Defendants Evans and Martin failed to reorder catheters, and thus Plaintiff would need to reuse old catheters. (Doc. 1 at ¶ 237-38). In the complaint, Plaintiff alleges he advised Goin to purchase more at Walmart or Walgreens until replacements could be ordered. (Doc. 1 at ¶ 239).

Plaintiff further alleged that he used his last catheter on Sunday, March 27 at 6a.m. (Doc. 1 at ¶ 240). He attended treatment line that night at 6p.m. and complained of pain because he did not have a catheter. Plaintiff alleged in his complaint that Defendant Stephens told him the medical unit was out of French 14 catheters, so he would either have to wash and reuse a catheter or use a French 16 size. (Doc. 1 at ¶ 242). Plaintiff alleged Defendant Switzer and Eckel agreed, despite him stating that reuse was not recommended per the catheter packaging. (Doc. 1 at ¶ 243).

Plaintiff alleged that on Monday, March 28, 2022, he deposited an emergency grievance about the situation as he exited his wing to attend sick call for the severe pain. (Doc. 1 at ¶ 254). Plaintiff alleges that at the medical unit he was doubled over in pain

because he had not urinated for approximately 26 hours. Defendant Evans averred that she remembers seeing Plaintiff in the waiting room that day, and did not observe acute distress, but she nevertheless left immediately and secured catheters. (Evans Decl., Doc. 71-1 at ¶¶ 25-28).

The treatment line flowsheet reflects that on March 21, 2022, Plaintiff was given 10 catheters. (Doc. 71-5 at 295). On March 25, 2022, he returned, and the provider noted "unable to find #14 caths pt. states he still has some and will return Monday." (Doc. 71-5 at 295). The next note indicates that on March 28, 2022, Plaintiff was given three catheters in the evening. There are no notes for March 26 or 27, 2022. (Doc. 71-5 at 295). A nurse's note in Plaintiff's full medical chart from March 28, 2022, indicates that Plaintiff was sent to the healthcare unit that morning because he needed a straight catheter to urinate. (Doc. 71-5 at 39). The note further indicated that Plaintiff had run out of catheters, and that two were provided. (Doc. 71-5 at 39). The chart contains surrounding notes from March 22, 2022, and April 1, 2022, neither of which discuss a lack of catheters. (Doc. 71-5 at 38-39). The medical records tendered by all parties do not contain proof that Plaintiff sought care on March 26 or 27 or notified prison staff or healthcare staff that he was out of catheters or needed emergency attention for this issue. Neither the treatment line chart, nor the standard nursing chart have notes reflecting encounters on those dates.

Defendants Stephens (Doc. 69) and Switzer (Doc. 103) argue that they were not at work on the night of March 27, 2022, and thus could not have had the interaction with Plaintiff as described in his complaint. Plaintiff insists this is incorrect for a number of reasons. He argues that he did not receive comprehensive time records, and he suggests

that Defendant Stephens worked overtime that night. (Doc. 112 at 6, ¶12(d)). To support this assertion, he points to Illinois Administrative Directives that explain how employee and contractor time should be recorded. (Pltf. CD re Doc. 69, Exh. 80, 81). However, an examination of Stephens' timecard refutes this notion because the timecard reveals that on March 24, 2022, Stephens worked from 6:58a.m. until 11:00p.m.. (Doc. 71-2 at 12). Stephens also averred that she left work at 3:08p.m. on March 27, and thus did not interact with Plaintiff that night. (Stephens Decl., Doc. 71-2 ¶ 26). Plaintiff's generic reference to policies for timekeeping does not create a genuine dispute when compared to Stephens own timecard that reflects a previous long shit, and her affidavit that she did not work the night of the 27th. Plaintiff also faults Stephens for failing to make notes in his medical chart about this encounter, but Plaintiff has no evidence to support the notion that Stephens failed in this respect, and other available medical records demonstrate that Stephens was diligent about making notes when she interacted with Plaintiff. *See e.g.,* (Doc. 71-5 at 106-109 (detailed notes on interactions between Stephens and Plaintiff re catheter exchange in August of 2022)).

To the extent that Plaintiff tries to rely on the grievance he wrote over the weekend of March 26-27, and deposited for filing the morning of March 28, this grievance does nothing to bolster his claim specifically about Defendant Stephens, because it does not refer to any of the providers who were allegedly present by name. (Pltf. CD re Doc. 69, Exh. 1 pp. 1-2). All of the other documents he cites in this portion of his summary judgment response (Doc. 112 at 6-7) are generic and are not relevant to establish Stephens' presence or personal involvement on March 27, 2022. Without establishing that Stephens

was present on March 27, she cannot be held liable for deliberate indifference related to this incident.

Turning to Defendant Switzer, she has submitted her timecard reflecting that she did not work on March 27, 2022. (Doc. 104-2).  Plaintiff argues that the timecard is not an accurate reflection of hours worked because there is not a column labeled March 27, but this argument is unpersuasive.  Switzer submitted timesheets that clearly reflect two date ranges:  March 20-March 26, 2022, and March 27-April 2, 2022.  (Doc. 104-2).  Both ranges encompass a Sunday through a Saturday.  The mere fact that no line item is reflected for March 27, 2022, does not establish that Switzer was actually at work.  It is also noteworthy that at his deposition, Plaintiff indicated that he was unsure if he was correct in naming Switzer as a defendant, and he indicated once he was able to review further records, he may ultimately "release" Switzer from the case.  (Pltf. Dep., Doc. 71-8 at pp. 201:10-202:4).  Plaintiff's deposition was taken on January 5, 2025.  On April 15, 2025, Plaintiff filed a proposed amended complaint (Doc. 83-1), wherein he indicated "in my original complaint, filed 11/19/2023, I named Defendant Rebecca Switzer as a responsible party on 3/27/22.  I have now learned Switzer was off duty on this date and release her from any liability of this date only[.]"  (Doc. 83-1 at p. 9 ¶ 30).  Though the Court did not grant Plaintiff leave to file this amendment, this was a signed sworn pleading that clearly indicates Plaintiff no longer believed Switzer was present on March 27, 2022.  Despite the statement in the signed proposed amended pleading, Plaintiff now argues against summary judgment on the premise that Switzer perhaps worked.  At this juncture,

Plaintiff has insufficient evidence to establish that Switzer was present on March 27, 2022, and the claim against her fails.

This leaves Defendant Eckel, who argues that she did not have the interaction that Plaintiff described in his complaint on March 27, 2022, concerning his alleged need for catheters. Specifically, Eckel averred that if she had seen Plaintiff on that date she would have charted the encounter, and if he had an emergent need, she would have taken the issue up the chain for resolution. (Eckel Decl., Doc. 71-3 ¶¶ 24-30). Eckel's position is supported by the medical records, which contain no proof that Plaintiff visited nurse treatment line on March 26 or 27. (Doc. 71-5 at 295). Additionally, the more comprehensive medical charts with more detailed notes contain no information suggesting that Plaintiff sought care on March 26 or 27. (Doc. 71-5 at 38-40). Eckel also argues that even assuming arguendo that the interaction occurred as described, if she merely went along with another nurse directing Plaintiff to re-use a catheter, that is negligence at most, and a 2019 study shows that catheter re-use is a common off-label product use. (Doc. 71 at 32-33, n.4).

At this point, Plaintiff's claim against Eckel is supported by the allegations against unnamed nurses in his grievance and the assertions in his complaint itself. His deposition testimony also suggests that he maintains the claim he went to the nurse treatment line on March 27, 2022, though it does not link the incident directly to Eckel. He claims in the complaint that staff who were present (including Eckel and Stephens) told him to wash a re-use an old catheter and that if he got an infection it would be treated. He has supplied catheter packaging and articles that suggest washing and re-using a catheter is not

appropriate (Pltf. CD re Doc. 69, Exhs. 46, 47, 48, 71).  The Court finds that at this juncture, the allegations against Jane Doe nurses in the grievance are insufficient to establish personal responsibility of Eckel for the medical events that allegedly transpired on March 27, 2022.

This leaves Plaintiff with just the statements in the complaint attributing responsibility for the denial of a catheter the evening of March 27 in part to Eckel, but at summary judgment a non-movant cannot stand solely on the complaint to establish a dispute of material fact.  *See e.g.*, *Maroor v. Vencor Hospitals Illinois, Inc.*, 191 F.3d 456, * 2-3 (7th Cir. 1999)* ("To survive a summary judgment motion, Maroor had to do more than rest on her complaint; she had to point to specific evidence to raise a genuine issue of material fact." "Maroor cannot survive summary judgment merely by calling into question the affiants' credibility."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("a proper summary judgment motion [may] be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves[.]").  Plaintiff has not put forth any evidence aside from his assertions in the complaint demonstrating that he actually interacted with Eckel on the night of March 27, 2022, at treatment line to seek catheters.  By contrast, Eckel has averred this encounter did not happen or she would have charted it and assessed the situation.

Regardless of if Plaintiff did or did not see Eckel, and if it was or was not appropriate to recommend catheter re-use, Plaintiff's Eighth Amendment claim against Eckel also fails for a more fundamental reason.  Plaintiff seeks compensatory and punitive damages from Eckel, but he has not demonstrated physical or mental harm warranting

recovery from Eckel.  The Prison Litigation Reform Act (PLRA) limits an inmate's ability to recover compensatory damages for an Eighth Amendment deliberate indifference claim to scenarios where there is a physical injury, but Plaintiff testified at his deposition that he did not suffer harm other than temporary pain from March 27-28, 2022.  *See Hacker v. Dart*, 62 F.4th 1073, 1078 (7th Cir. 2023) (the PLRA requires a showing of some physical injury for compensatory damages, but not punitive damages).  In fact, he testified that when he went to nurse treatment line on March 27, 2022, he did not ask for emergency care because the pain was not that intense at that point.  (Pltf. Dep., Doc. 71-8 at pp. 163:23-164:16).  Eckel averred, and declarations from fellow nurses show that if Plaintiff had asked any employee for immediate care he would have received a response.  Plaintiff also testified that after his release from prison his urologist did not note any new damage to his bladder, and he felt good.  (Pltf. Dep., Doc. 71-8 at p. 211:9-23).  Without a physical injury, Plaintiff does not qualify for compensatory damages on a claim against Eckel.

He also sought punitive damages, but punitive damages are only appropriate when the "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *McKinley v. Trattles*, 732 F.2d 1320, 1326 (7th Cir. 1984); *see also Ollie v. Atchison*, 753 Fed. App'x 406, 407-08 (7th Cir. 2019) (noting that to receive punitive damages, an inmate would have to show that the defendants' conduct was motivated by "evil motive or intent" or reckless or callous indifference, but that he had failed to make such a showing where the defendants' own evidence exhibited they did not act with such malice).  The Court did not find any such reckless or callous conduct with relation to

Defendant Eckel's alleged conduct on March 27, 2022, and as will be revealed by the remainder of this analysis, it also did not find any such conduct for any of the other defendants discussed in this Order. As such, the demand for punitive damages does not save Plaintiff's claim against Eckel.

In association with the March 27-28, 2022, catheter shortage, Plaintiff also faults Defendant Evans for failing as the Director of Nursing to ensure an adequate supply of catheters were on hand at Robinson. He argues that Evans knew of the need to re-stock catheters as early as Monday, March 21, 2022, because the nurse at treatment line allegedly told him as much. (Pltf. Dep., Doc. 71-8 at 154:22-155:18). This particular statement is hearsay and cannot be used at summary judgment to establish that Evans had knowledge of the lack of catheters as early as March 21, 2022. *See* Fed. R. Ev. 801 and 802; *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). Plaintiff also contends that on March 25, 2022, the lack of catheters was known and acknowledged at treatment line. The treatment line flowsheet supports this in so much as the provider wrote on March 25, 2022, that there were no more catheters, but the provider also wrote that Plaintiff thought he may have enough to make it thru the weekend. (Doc. 71-2 at 295). Additionally, the provider at treatment line was not Evans and did not document that they notified Evans.

Regardless of what the treatment line staff knew or documented, Evans averred that she was not made aware of the catheter shortage until Monday, March 28, 2022, at which time she observed Plaintiff in the waiting room and immediately went to a local

hospital to retrieve catheters.  (Evans Decl., Doc. 71-1 at ¶¶ 25-28).  Evans also averred that while she was the Director of Nursing, nursing staff were not authorized to independently obtain medical supplies from outside sources, and she herself was only authorized to get supplies from two sources.  (Evans Decl., Doc. 71-1 at ¶¶ 29, 33).

Plaintiff has not set forth specific evidence to demonstrate that Evans had personal knowledge about the catheter shortage he faced, which allegedly left him without a catheter from March 27, 2022, until March 28, 2022.  In response to summary judgment Plaintiff pointed to Administrative Directives about maintaining a forward stock (Pltf. CD re Doc. 69, Exh. 39), but the existence of a policy about maintaining stock does not establish personal knowledge for Evans about an issue with the stock.  He also cited to a 15-page word document about the roles of a nurse in the correctional setting, but the document does not have a clear source, and the general guidance does not demonstrate Evans' personal knowledge of the catheter shortage.   (Pltf. CD re Doc. 69, Exh. 64).  Plaintiff added references to Illinois state law on the knowledge element of negligence, and he also included an alleged job description for a Director of Nursing with Wexford (Pltf. CD re Doc. 69, Exh. 28, 76).  None of this evidence, nor any of the other evidence he discussed in this section of his response to summary judgment is enough to establish that Evans actually knew that he was at risk of harm because the prison had an insufficient supply of catheters, and that she acted with reckless disregard for the situation.  At most, Plaintiff suggests negligence, which is not enough to sustain a claim.

Turning to the second discrete incident of lacking supplies, Plaintiff alleges that on May 16, 2022, when he attended treatment line, Defendant Goin informed him that

they were out of lubricant jelly packets. (Doc. 1 at ¶ 269). He alleges Goin gave him packets of antibiotic cream and indicated she did not know what else to do. (Doc. 1 at ¶ 270). Plaintiff returned to his housing unit and attempted to use the antibiotic cream but gave up when he noticed a burning sensation. (Doc. 1 at ¶ 270). He alleges he was forced to wait 52 hours before returning to treatment line to receive the proper lubricant. (Doc. 1 at ¶ 273). On May 20, 2022, he met with Defendant Martin about the issue. When he explained the issue, Martin summoned Evans to hear about it, Evans allegedly admitted to failing to order supplies, and the Martin ensured it would not happen again. (Doc. 1 at ¶ 277-78, 82).

The treatment line notes for May 16, 2022, reflect that Plaintiff returned 14 used catheters, got 14 new catheters, and "4 TAO." (Pltf. CD re Doc. 69, Exh. 15; Doc. 71-5 at 2). On a call pass from May 16, 2022, Plaintiff took notes about the encounter. He indicated he dealt with "the same nurse that told me to use the caths over after washing them with soap and water." (Pltf. CD re Doc. 69, Exh. 1, p. 4). He noted that she gave him "Triple Antibiotic Ointment," instead of jelly, and said he will get jelly "soon when they come in." (Pltf. CD re Doc. 69, Exh. 1, p. 4).

Currently, Defendants Evans and Martin are seeking summary judgment concerning the May 16, 2022, lubricant shortage. Evans avers that she did not have personal knowledge about the lack of jelly packets until after the incident had been resolved on May 18, 2022. (Evans Decl., Doc. 71-1 at ¶¶ 38-40). She further averred that she never failed to order supplies knowing that supplies on hand were insufficient to meet inmate needs. (Evans Decl., Doc. 71-1 at ¶ 41). Plaintiff has no evidence to the

contrary.  The evidence he presented concerning the March 27-28 catheter shortage is the same evidence he relies on regarding the jelly lubricant shortage.  (Doc. 112 at 7-9).

Plaintiff argues that Evans had a duty to stock equipment and incompetently breached that duty by ignoring nurses' information about his need for supplies, but he has no proof that anyone told Evans about the jelly issue before May 20, 2022.  (Doc. 112 at ¶13(h)).  There is no proof that Evans knew to anticipate a shortage, nor does Plaintiff detail any efforts to notify Evans or other staff between May 16 and 18 when he received new jelly packets.  In the single paragraph that Plaintiff devoted to responding to this issue at summary judgment, he simply points to the treatment line notes showing that TAO ointment was provided, and he cites to a document on common mistakes with catheter use.  (Pltf. CD re Doc. 69, Exh. 15, Exh. 47).  Neither of these documents establishes personal knowledge of Evans for the jelly shortage or deliberate indifference as opposed to negligence.

As for Defendant Martin, he averred that he was not responsible for ordering supplies (Martin Decl., Doc. 81-3 at ¶ 7).  When Martin was made aware of the issue he held a meeting and called Evans to ensure she resolved it.  (Doc. 1 at ¶¶277-282).  This is not deliberate indifference.  Plaintiff goes on at length in response to Martin's motion for summary judgment and statement of material facts, arguing that Martin had greater duties than he acknowledged in his affidavit.  To support these contentions, Plaintiff cites to internet research he did by reviewing Martin's LinkedIn account and Facebook account, as well by reference to various Wexford position descriptions that he located related to healthcare.  (Doc. 111 at p. 4-5; Pltf. CD re Doc. 81, Exhs. 76-77).  Plaintiff also

argued that Martin failed professional duties as a nurse by failing to ensure medical staff was compliant with various provisions of the Illinois Nurse Practice Act, and ethical obligations for nursing. (Pltf. CD re Doc. 81, Exhs. 23-38, 62-68).

Plaintiff's insistence that Martin must be responsible for ordering supplies is not supported by the generic evidence he has gathered from job postings, or general guidance on nursing best practices. Plaintiff argues that because Martin described his job in vague terms in his affidavit, Martin's description leaves things open to interpretation, but Martin was not vague or equivocal when he stated that it was not his responsibility to order supplies or that the ordering responsibility fell to a regional administrator if the director of nursing role was unfilled. (Martin Decl., Doc. 81-3 at ¶¶ 5-7). Additionally, the position descriptions Plaintiff references are for jobs filled by Wexford in states other than Illinois, but Defendant Martin was employed by IDOC and thus was not necessarily bound by a position description for a Wexford job in another state. Plaintiff also argues that Martin has failed to provide his own position description or to provide a "duties and responsibilities manual" for his role (Doc. 111 at 9), but to the extent Plaintiff believes he did not receive adequate discovery to create a dispute about Martin's responsibilities, it is too late to raise discovery disputes now. Ultimately, Plaintiff does not have any direct evidence to challenge Martin's own statement that he had no role in procuring supplies. Thus, Martin cannot be held liable for shortages in supplies.

Plaintiff also argues in response to summary judgment that Martin is responsible on a more general level because he allowed medical personnel to enforce the catheter exchange rule and improperly advised reuse of old catheters if there was a shortage.

(Doc. 111 at 9-11). The record simply does not support a finding in Plaintiff's favor on these generic assertions. Martin and Plaintiff agree that Martin never provided direct care and was never the one to distribute supplies or assess Plaintiff's medical well-being. Martin also averred he never instructed a nurse to refuse a new catheter if Plaintiff did not provide one for exchange, and he did not have authority to demand that nurses withhold catheters. (Martin Decl., Doc. 81-3 at ¶ 9). By contrast, the evidence demonstrates that when Martin was alerted to issues, he willingly met with Plaintiff, and as evidenced by the meeting with Evans on May 20, 2022, he made efforts to ensure appropriate personnel were aware of issues. There is also no evidence that Plaintiff ever reused a catheter or suffered any harm by doing so. As such, there is simply no evidence to support a claim against Martin for his alleged role in Plaintiff's healthcare at Robinson.

Third, Plaintiff alleges that while in segregation from June 1-3rd, 2022, Defendant Rice denied him access to catheters from about 7:30a.m. to 2:30p.m. on June 3. (Doc. 1 at ¶ 286-290). The parties do not dispute that Plaintiff informed Rice of his need for a catheter shortly after Rice's shift began. Plaintiff indicated in his complaint that Rice told him the nurse would bring catheters when they were ready. (Doc. 1 at ¶ 289; Rice Decl., Doc. 81-4 at ¶ 12). Rice avers that he contacted the medical unit three times to seek catheters during that shift, and that he did not have authority to get or distribute medical supplies on his own. (Rice Decl., Doc. 81-4 at ¶¶ 3, 12). Rice claims that despite talking to Plaintiff multiple times that day about catheters, and making three calls to the medical unit, he never received any catheters to provide to Plaintiff prior to Plaintiff being

escorted away from segregation by another officer around 2p.m.. (Rice Decl., Doc. 81-4 at ¶¶ 8-16).

Plaintiff disputes Rice's version of events, arguing that Rice in fact had the catheters available to him for hours but simply opted not to hand them over until Plaintiff was exiting the medical unit. (Doc. 1 at ¶¶ 285-91). At summary judgment, Plaintiff supports this contention by pointing to a one-page handwritten document that is undated and unsigned. (Pltf. CD re Doc. 81, Exh. 7, p 1.). In the document, he alleges the officer working seg purposefully and maliciously refused catheters despite healthcare having brought over five catheters to be distributed as needed. (*Id.*). He also points to the nurses' treatment flow sheet, but that only demonstrates that catheters were brought to segregation on June 1, 2022, not that any additional catheters were distributed on June 3, 2022. (Pltf. CD re Doc. 81, Exh. 15). Finally, he references his handwritten calendar note, in which he stated, "C.O. @ seg had caths but refused to give them to me after I asked[.]" (Pltf. CD re Doc. 81, Exh. 78, p. 4). "No caths until 2:00p.m.." (*Id.*). At the summary judgment phase, the evidence Plaintiff points to is speculative, and his response contains many conclusory statements that are not supported by discrete evidentiary proof (Doc. 119 pp. 11-13), whereas Defendant Rice has produced a sworn statement that he did not possess any catheters on June 3, made multiple attempts to secure catheters from the medical unit, and ultimately did not see Plaintiff provided with catheters before he left segregation. Plaintiff has not pointed to any concrete evidence demonstrating that Rice actually possessed catheters and denied him care. As such, Plaintiff has failed to demonstrate deliberate indifference by Rice. Furthermore, there is no allegation that

Plaintiff suffered anything more than temporary discomfort from this alleged interaction with Rice, so even if Rice possessed and withheld the catheters for some amount of time between 7:30a.m. and 2:00p.m. on June 3, Plaintiff has not identified a compensable injury.

To the extent that Plaintiff now attempts to suggest Rice's actions were retaliation for an earlier grievance, Plaintiff was not allowed to proceed beyond initial review against Rice on a retaliation claim. A review of the paragraphs in the complaint concerning Rice's withholding of catheters made no mention of alleged retaliation. (Doc. 1 at ¶¶ 285-297). Plaintiff cannot present a new or legally distinct claim against Rice in response to summary judgment, so these allegations will not be discussed further. Summary judgment shall be granted in Rice's favor and Claim 2 is extinguished in full.

Aside from the three discrete instances when Plaintiff complained he was entirely without supplies needed to catheterize, there were many instances in the Complaint when Plaintiff alleged that he had problems accessing supplies because medical or security staff would insist that he needed to follow a catheter exchange rule without providing proof of the rule. These instances implicate all defendants named in association with Claim 1 at one point or another throughout the Complaint, and the parties discussed these events in some level of detail in their pleadings[8], but after reviewing the many arguments and the voluminous evidence, the Court finds it unnecessary to recount each instance individually. Ultimately, all of the allegations about

---

[8] The Wexford Defendants discuss incidents on July 4, July 5, August 25, August 27, August 28, and September 28, 2022 (Doc. 71); the IDOC Defendants discussed general interactions with Defendant Martin, and an alleged refusal incident in Defendant Steadman's presence on September 27, 2022 (Doc. 81).

the alleged catheter exchange rule fail for the same reason, because an inmate is not free to disregard directions from staff, and if he is harmed by his own disobedience, that harm is not a constitutional violation.

As the Seventh Circuit explained in *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005), an inmate cannot "be permitted to engineer an Eighth Amendment violation."  For example, the inmate cannot refuse dinner every single night unless served caviar and champagne once a month, because the lack of meals is then a by-product of his own insistence rather than the prison's refusal to serve adequate food.  *Id*; *see also Smith v. Marthakis, et al.*, 2025 WL 2613448 at * 4 (N.D. Ind. Sept. 9, 2025) (finding that an inmate could not establish an Eighth Amendment deliberate indifference claim about inadequate pain management where he was offered medications but refused to take them or to take them regularly enough to establish effectiveness because he preferred different medications).  The Seventh Circuit has also held that a defendant is not liable for deliberate indifference where an inmate refuses treatment or is non-compliant.  *See e.g.*, *Poole v. Issacs*, 703 F.3d 1024, 1027-28 (7th Cir. 2012) (finding that a healthcare administrator was not liable for deliberate indifference where she insisted the inmate pay a $2 co-pay before receiving treatment for dental pain, and the inmate refused, thus delaying his own care); *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (finding no deliberate indifference where the inmate himself delayed in seeking care, and then was repeatedly uncooperative with the care offered); *Cherry v. Berge*, 98 Fed. App'x 513, 515 (7th Cir. 2004) (finding that staff were not deliberately indifferent for multiple occasions of failing to distribute two types of medications because Plaintiff understood and was

physically able to comply with rules for medication distribution, but consciously refused to follow the protocol).  Plaintiff's situation is exactly like the situation in *Rodriguez* and *Cherry*, in so much as he essentially forced an alleged constitutional violation by his insistence on refusing to follow the basic catheter exchange rule.  Defendants have provided legitimate reasons for the rule, such as monitoring his flow of urine and preventing security and safety hazards.  (Evans Decl., Doc. 71-1 at ¶ 12).

The medical records show[9], and Plaintiff readily admitted at his deposition, that sometimes he complied with the rule to avoid a hassle with staff and other times he simply refused because he did not like the rule and felt it was not legitimate without being published in the orientation manual[10].  Plaintiff attempts to excuse his behavior by alleging that having the catheters in his cell sometimes created conflict with cellmates and was disgusting (Pltf. Dep., Doc. 71-8 at 95:3-98:4; 100:9-101:2), but these excuses are non-starters.  Plaintiff does not offer specific evidence that  the alleged conflicts with cellmates reached a boiling point or that he informed staff there was a risk to his own safety related to this issue.  Even if he had evidence of problems with cellmates, that alone does not change the prison rule.  Additionally, he admitted that he could have gone to nurse treatment line every single day to exchange catheters, but he simply decided not to do so out of personal preference.  (Pltf. Dep., Doc. 71-8 at 136:14-18; 137:11-138:13).

---

[9] For example, on April 27, 2022, and May 16, 2022, Plaintiff was noted as returning used catheters.  (Doc. 71-5 at 296).

[10] Plaintiff discussed his view of the catheter exchange rule multiple times during his deposition.  (Pltf. Dep., Doc. 71-8 at 45:4-25; 46:20-48:20; 100:9-101:2; 147-152).  He stated at his deposition and reiterated in his summary judgment responses that he simply believed he did not have to follow the rule because it was not legitimate.  (Doc. 112 at p. 12, "I have the right to disregard a direct order, without punishment, when the direct order may cause injury or harm, or subject me to injury or harm from another as stated in my complaint.").

As a whole, the facts demonstrate that at most, Plaintiff's conduct engineered a problem with accessing treatment. An inmate cannot engineer a violation. Plaintiff also attempts to argue that the rule is not valid by providing excerpts of the prison's inmate handbook that contain many rules on inmate conduct. (Pltf. CD re Doc. 69, Exh. 61 pp. 1-8; Pltf. CD re Doc. 81, Exh. 61 pp. 1-8). He contends that because the rule was not delineated in the handbook, it was not valid. To support this line of argument, he cites *Coffman v. Trickey*, 884 F.2d 1057 (1989) and other cases on due process. The *Coffman* case involved an inmate who received disciplinary sanctions for violating a generic prison rule (Rule 29) that prohibited "knowingly failing to abide by any published institutional rule." *Id.* at 1058. The inmate was disciplined solely for Rule 29, and the prison was unable to produce any evidence that there was a published underlying rule to support the Rule 29 violation. Thus, the Court found the Rule 29 charge unsubstantiated by the record.

Plaintiff's situation is distinct. Although he complains that the catheter exchange rule was not published, he also is not currently proceeding on a valid Fourteenth Amendment Due process claim for punishment, such as placement in segregation. Instead, he argues that he was "punished" by the occasional withholding of catheters when he would refuse to tender used catheters for an exchange. The Court has already dealt with the instances when he claims he truly had no catheter, so now it is only addressing instances where he wanted, but did not absolutely need an exchange. In these instances, his situation is more akin to an inmate engineering a harm than it is to actual improper punishment. As the Seventh Circuit found in *Cherry*, an inmate cannot

consciously choose to violate a medical protocol, while simultaneously faulting prison staff for deliberate indifference.  98 Fed. App'x at 515.  The medical records, Plaintiff's deposition testimony, and Plaintiff's arguments in response to summary judgment all show that he adamantly refused to follow the catheter rule, while knowing that his refusal to comply with hinder his access to care.  A plaintiff cannot engineer a constitutional violation, so Plaintiff's claims related to the catheter exchange rule fail.

### Claim 5: Retaliation

Turning now to Claim 5, the Court allowed Plaintiff to proceed against Defendants Steadman, Mason, Glendenning, and Stephens, on the allegation that these individuals allegedly retaliated against Plaintiff.  Beginning with Stephens, Plaintiff alleged that on August 28, 2022, Stephens refused him catheters because he did not bring any old catheters to exchange.  (Doc. 1 at ¶¶ 329).  Plaintiff further alleged that Stephens called for a non-party, Williams, and reported Plaintiff was refusing to follow the rule.  (Doc. 1 at 330).  Defendant Stephens avers that she did not call for Williams because he was already present at sick call, and she did not have any influence over his conduct. (Stephens Decl., Doc. 71-2 at ¶¶ 41-42).  She avers that Williams and Plaintiff stepped outside of the medical unit, and when they returned Williams told her Plaintiff had been re-educated on the rule and directed her to provide catheters.  (Stephens Decl., Doc. 71-2 at ¶ 43).  She provided catheters and documented this in the nursing notes and treatment line chart.  (Stephens Decl., Doc. 71-2 at ¶¶ 43-44; Doc. 71-5 at 108-09, 298).

At summary judgment, Plaintiff argues that Stephens conduct in this interaction was retaliatory because she enlisted Williams to threaten and intimidate him.  (Doc. 112

at 13-14).  Plaintiff does not explicitly state what speech he believes established a basis for
retaliation here.  Reading the record broadly in Plaintiff's favor, the Court will assume he
means that his verbal request for care in the form of catheters was protected speech.
Plaintiff then contends that Stephens engaged in an adverse action that chilled further
speech by summoning Williams, who took him to another area of the prison and
threatened him.  To support these assertions, Plaintiff cites to notes he made on his
August 28, 2022, call pass (Pltf. CD re Doc. 69, Exh. 11 p. 4), notes on his August calendar
(Pltf. CD re Doc. 69, Exh. 78 p. 7); and the notes in the nursing record that Stephens
already cited (Pltf. CD re Doc. 69, Exh. 21 p. 5; Doc. 71-5 at 108-09).

A successful claim for First Amendment retaliation requires that a plaintiff show,
"(1) he engaged in activity protected by the First Amendment; (2) he suffered a
deprivation that would likely deter First Amendment activity in the future; and (3) the
First Amendment activity was 'at least a motivating factor' in the Defendants' decision to
take the retaliatory action." _Bridges v. Gilbert_, 557 F.3d 541, 546 (7th Cir. 2009) (quoting
_Woodruff v. Mason_, 542 F.3d 545, 551 (7th Cir. 2008)).  "To make a prima facie showing of
causation the plaintiff must show only that the defendant's conduct was a sufficient
condition of the plaintiff's injury." _Greene v. Doruff_, 660 F.3d 975, 980 (7th Cir. 2011).  Then
the burden shifts to the defendant to rebut plaintiff's prima facie showing by establishing
that "his conduct was not a necessary condition of the harm—the harm would have
occurred anyway." _Id._

Inmates retain a First Amendment right to complain about prison staff, whether
orally or in writing, but only in ways consistent with their status as prisoners. _See Turner_

*v. Safley*, 482 U.S. 78, 89–90 (1987).  However, name calling, backtalk, or arguments are
not protected speech.  *See e.g.*, *Caffey v. Maue*, 679 Fed. App'x 487, 490-91 (7th Cir. 2017);
*Kervin v. Barnes*, 787 F.3d 833, 834 (7th Cir. 2015) (finding an inmate engaged in
unprotected backtalk when he insisted on talking to a lawyer after a guard said no).
Asking for medical care verbally or in writing is generally protected speech, but Plaintiff's
situation is different because he was demanding care despite his own alleged violation of
a prison rule.  Actions that would occur regardless of any protected speech cannot form
the basis for a retaliation claim.  *See e.g.*, *Manuel v. Nalley*, 966 F.3d 678, 681 (7th Cir.
2020) (finding that at summary judgment, an inmate could not proceed on
his retaliation claim where the defendants established that they did a cell shakedown
based on a report of contraband), *Antoine v. Ramos*, 497 Fed. App'x 631, 634 (7th Cir.
2012) (finding that a shakedown was not retaliatory where guards alleged that they
conducted the shakedown due to a report of contraband, and Plaintiff did not proffer any
evidence that this was inaccurate).  Stephens indicates in her affidavit that Plaintiff
frequently sought catheters without following the exchange rule, and she frequently re-
educated him on the rule.  (Stephens Decl., Doc. 71-2 at ¶¶ 39-40).  August 28 was no
different, he did not have catheters to exchange, so she was not going to provide new
catheters.  On these instances, Stephens was not withholding treatment out of retaliation
based on Plaintiff's protected speech but was instead enforcing a rule that multiple
Defendants have averred existed.

 She also ultimately gave Plaintiff six catheters at the direction of Williams on
August 28.  Enforcing a valid prison rule cannot be retaliation, and although Plaintiff

claims that it was an adverse action that made him fearful, the evidence shows otherwise. Though Plaintiff did not return to treatment line the night of August 28, he had just been given six catheters that morning and had no apparent need to return.  However, the nurse treatment flow sheet demonstrates that he returned on August 29, 31, and September 2 at regular intervals.  (Pltf. CD re Doc. 69, Exh. 16, p. 4).  Thus, on the whole, Plaintiff did not suffer an adverse action, and even if he did, the adverse issue arose because of his own conduct of refusing to follow a rule, rather than as a form of retaliation.

Plaintiff alleges he had a second run-in with Stephens on December 1, 2022, that ultimately resulted in a disciplinary ticket.  Stephens claims that when Plaintiff came to treatment line he demanded catheters but had no exchanges (Stephens Decl., Doc. 71-2 at ¶ 48).  By contrast, Plaintiff claims he did not come to treatment line for catheters at all, and instead only wanted a red biohazard bag.  (Doc. 112 at 16).  After returning to his unit with the biohazard bag, Plaintiff alleges his cell was then shaken down, and Stephens ultimately wrote him a ticket for lying and saying he had no used catheters when the search uncovered three used catheters in his property and other new catheters.  (Doc. 1 at ¶¶ 426-429).  The disciplinary report was ultimately expunged, and Plaintiff does not allege he received any discipline for the incident.  This series of events cannot form a basis for a retaliation claim against Stephens, because the discipline was expunged before any consequence attached.  *See Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009) (a single retaliatory discipline charge that is later expunged cannot serve as a basis for a § 1983 action).

Plaintiff also alleges that Defendant Glendenning engaged in retaliatory conduct when she refused to give new catheters without an exchange on September 27, 2022, and issued a disciplinary ticket regarding the encounter. (Doc. 1 at ¶¶ 359-385). As the Court explained in association with Defendant Stephens, asking for treatment may be protected speech, but becoming argumentative or refusing to follow prison rules is not protected. Glendenning averred that Plaintiff "puffed up, leaned forward," and yelled at her. (Glendenning Aff., Doc. 71-4 at ¶¶ 45-47). Plaintiff admitted at his deposition that he may have raised his voice. (Pltf. Dep., Doc. 71-8 at 180:19-181:1). Plaintiff's conduct transformed the incident from possible protected speech to improper conduct. Additionally, Glendenning averred that she wrote the disciplinary ticket because she felt intimidated and threatened, and not because Plaintiff complained about his healthcare or threatened to write a grievance. (Glendenning Aff., Doc. 71-4, at ¶¶ 47-53). The ticket resulted in seven days of a commissary restriction (Doc. 71-5 at 495), and Plaintiff's allegations in his complaint or summary judgment response do not provide a sufficient basis to undermine the ticket. As such, not only was Plaintiff's speech not protected, but there was a valid basis for the discipline, which also refutes any retaliation claim.

Finally, Plaintiff challenges actions by Defendants Steadman and Mason, specifically, the actions taken on November 27, 2022. On that date, Plaintiff alleges Steadman and Mason conspired against him as retaliation for a grievance he filed about them in relation to the above incident with Glendenning on September 27, 2022. (Doc. 1 at ¶¶ 417-22). Specifically, Plaintiff claims that at some point while he lived in the healthcare unit, Steadman had given him a TV, however, a fellow inmate told him that

he overheard Steadman telling Mason to check the TV because she would "take it from

him." (Doc. 1 at ¶ 419). Mason then confiscated the TV and wrote a disciplinary report

about it. (Doc. 1 at ¶¶ 420-21). Both Steadman and Mason averred that they were not

aware of any grievances that Plaintiff had written against them. (Mason Decl., Doc. 81-6

at ¶ 12; Steadman Decl., Doc. 81-5 at ¶ 11). This casts doubt on Plaintiff's assertion that

Steadman or Mason's actions were motivated by protected speech, but even assuming

they were, Plaintiff has not demonstrated a causal link between an alleged grievance

about September 27 and the TV confiscation on November 27, 2022 .

All Plaintiff has is his reliance on the alleged statement from a fellow inmate

between Steadman and Mason, but this is inadmissible hearsay. *See* Fed. R. Ev. 801 and

802; *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon

inadmissible hearsay to oppose a motion for summary judgment."). Even if Plaintiff

could establish protected speech or a causal link, Steadman and Mason attested that

Plaintiff got a disciplinary ticket for possessing contraband, and not for any other reason.

(Steadman Decl., Doc. 81-5 at ¶ 10; Mason Decl., Doc. 81-6 at 6-9). Plaintiff openly admits

even in his summary judgment response that the TV was contraband, and he should not

have possessed it without securing a permit. (Doc. 111 at 19-20). This provides a valid

independent basis for the discipline to stand and eviscerates retaliation. In sum, the

Defendants named in association with the retaliation claims (Steadman, Mason,

Glendenning and Stephens) are entitled to summary judgment.

Based on the foregoing analysis, summary judgment will be granted in full in favor

of the Wexford Defendants, the IDOC Defendants, and Defendant Switzer. This

extinguishes all claims against these defendants (Evans, Eckel, Glendenning, Stephens, Mason, Steadman, Martin, Rice, and Switzer).

### Defendants Dopaso & Goin

As the Court indicated in earlier sections of this Order, Defendants Goin and Dopaso remain unserved. Federal Rule of Civil Procedure 56(f) allows a court, after giving notice and a reasonable time to respond, to grant summary judgment for a non-movant. Here, the Court finds it appropriate to invoke Rule 56(f) as to Defendants Dopaso and Goin. First, as to Dopaso, a close reading of the complaint reveals that Dopaso is only mentioned in association with a single incident of catheter refusal on July 4, 2022, in the healthcare unit. (Doc. 1 at ¶¶ 298-300). Plaintiff alleges that on this occasion, at evening treatment line Defendant Glendenning refused him catheters because he did not have any old catheters to exchange, and Dopaso agreed with this determination. As the Court explained in the analysis section of Claims 1-2, a plaintiff cannot engineer a constitutional violation by refusing to follow a prison rule, and medical providers are not deliberately indifferent for enforcing a rule, even if it means denying or delaying treatment. Considering the analysis conducted already in relation to Glendenning and the catheter exchange rule, there is no scenario where Plaintiff could prevail against Defendant Dopaso.

As to Defendant Goin, per the Complaint, Goin informed Plaintiff on March 21 and 25, 2022, that the prison was out of French 14 catheters, that Evans had failed to order more, and that he would have to wash and re-use old catheters until a new supply arrived. (Doc. 1 at ¶¶ 236-239). He also alleged that on May 16, 2022, Goin told him that

the medical unit was out of lubricant jelly, and she provided him packets of antibiotic ointment and advised she did not know what else to do. (Doc. 1 at ¶¶ 269-270). In the amended complaint that was not allowed, Plaintiff stated that the nurse he spoke to on March 21, 2022, was not Goin. (Doc. 83-1 at p. 8, ¶ 28) ("My original complaint, filed 11/19/2023, addressed Anastacia Goin as the responsible nurse on 3/21 and 5/16/2022. However, after receiving Defendants discovery, and having reviewed said discovery, I've now learned the nurse in question on these dates was not Goin."). Thus, Plaintiff's sole allegation in the complaint against Goin is that on March 25, 2022, she advised him that the medical unit was out of catheters and that he may need to wash and reuse one. (Doc. 1 at ¶¶ 237-239). The nurse treatment line notes reflect that on March 25, 2022, Plaintiff informed Goin that he *may* have enough catheters to last the weekend. Against this backdrop, it appears unlikely that Plaintiff can establish that Goin had personal knowledge he would run out of catheters and be unable to urinate. As was mentioned in the analysis section above, the medical records do not substantiate Plaintiff's assertion that he returned to the medical unit on March 26 or March 27, 2022, to inform anyone he had run out of catheters or that he was experiencing a medical emergency and was unable to urinate for a lengthy period of time. Thus, on the available evidence, it appears unlikely that Plaintiff can substantiate any claim against Goin.

Per Rule 56(f), the Court will provide Plaintiff with 30 days to respond to this assessment of the merit of his claims against Defendants Goin and Dopaso. Plaintiff shall file a brief of 10 pages or less, and he may support his brief with documentary evidence. If Plaintiff wishes to submit documentary evidence, he shall submit it in paper format.

The Court notes that although Plaintiff resorted to sending CDs with his exhibits in JPEG format, he has previously submitted a significant amount of this evidence in normal documentary format with his complaint[11]. To the extent that Plaintiff wishes to reference pre-existing evidence, he could even simply cite to where it exists with the complaint, rather than submitting it anew.

The Court also notes that throughout the course of the litigation, Wexford Health Sources, Inc., and the Warden of Robinson have both been added to this case as parties to assist in securing service information for Dopaso and Goin. The Court finds that these entities have provided as much information as they possess about the defendants and the matter now rests with the Marshals to attempt to execute summons. Thus, the Clerk of Court will be directed to terminate Wexford and the Warden of Robinson.

### DISPOSITION

Defendants' Evans, Stephens, Glendenning and Eckel's Motion for Summary Judgment (Doc. 69) is **GRANTED** in full; Defendants' Martin, Rice, Steadman, and Mason's Motion for Summary Judgment (Doc. 80) is **GRANTED** in full; and Defendant Switzer's Motion for Summary Judgment (Doc. 103) is **GRANTED** in full. This extinguishes Claims 1, 2, and 5 against these defendants. The Clerk of Court shall **TERMINATE** Defendants Evans, Eckel, Glendenning, Stephens, Switzer, Mason,

---

[11] The complaint included grievances and disciplinary documentation (Doc. 1-2); copies of Plaintiff's call passes with his notes (Doc. 1-3); and copies of assorted medical literature on nursing standards and best practices for catheter use (Doc. 1-5). These are all items that he reattached in a random order in response to the motions for summary judgment via his submission of the three CDs.

Steadman, Martin, and Rice because all claims against these parties are resolved. Judgment shall be entered in their favor at the close of this case.

Defendants' Motions for an Extension of Time to Reply (Docs. 114, 116) are **DENIED**.

The Clerk of Court is **DIRECTED** to **TERMINATE** Defendants Wexford Health Sources, Inc., and the Warden of Robinson, because these parties have provided as much information as possible to assist in serving Goin and Dopaso.

Plaintiff shall have **30 days to file a response** about the appropriateness of summary judgment under Federal Rule of Civil Procedure 56(f) for Defendants Goin and Dopaso. The response shall be limited to 10 pages of written argument and shall be accompanied by paper copies of any exhibits Plaintiff wishes for the Court to review.

**IT IS SO ORDERED.**

Dated: September 19, 2025

_____
DAVID W. DUGAN
United States District Judge

| CD re Doc. 69 | Defendants Glendenning, Eckel, Stephens, and Evans |
|---|---|
| Exhibit No. | Description |
| 1 (pp. 1-8) | Grievance documentation re March 27, 2022, catheter shortage & May 16, 2022, jelly lubricant shortage |
| 2 (pp.1-4) | September 16, 2022, grievance documents re catheter exchange, and issue with Stephens/Williams |
| 3 (pp.1-6) | Grievance re September 27, 2022, catheter exchange issue with Glendenning |
| 4 (pp.1-4) | November 2022 grievance re miscellaneous ongoing issues and a disciplinary ticket |
| 5 (pp. 1-9) | December 2022 grievance re alleged retaliation and discipline issue with Stephens |
| 6 (pp. 1-3) | March 2023 grievance re outside referral and sick call process |
| 7 (pp. 1-5) | One-page undated unsigned narrative re: June 3, 2022, with Defendant Rice, plus April 2022 grievance against Rice regarding access to forms, and FOIA documents seeking Rice's name after the segregation incident |
| 8 (pp. 1-6) | Disciplinary documents concerning September 27, 2022, incident with Defendant Glendenning during treatment line catheter exchange |
| 9 (pp. 1-5) | Disciplinary documents concerning November 22, 2022, disagreement over call pass with Defendant Mason, and disciplinary documents concerning November 27, 2022, contraband TV with Mason |
| 10 (pp. 1-7) | Disciplinary documents concerning December 1, 2022, incident with Defendant Stephens |
| 11 (pp. 1-16) | Copies of nurse treatment line call passes where Plaintiff kept handwritten notes about interactions with staff |
| 12 (pp. 1-14) | Handwritten request forms that Plaintiff submitted for various issues |
| 13-20 | Nurse treatment line logs |
| 21 (pp.1-12) | Detailed nursing notes from various dates |
| 22 (pp.1-11) | Detailed nursing notes from Plaintiff's stay in the infirmary for cellulitis |
| 23-29 | Provisions of Illinois state statutes concerning nursing and negligence |
| 31-44 | Excerpts of the Illinois Administrative Code |
| 45-48 | Articles about cathetering |
| 49 | Article about emotional distress with no clear source |
| 50-60 | Prison medical intake forms, transfer summaries and medical permits |
| 61 (pp. 1-10) | Excerpts of the Robinson Orientation manual |
| 62-68 | Materials on nursing ethics and the standard of care |
| 69 (pp. 1-4) | Plaintiff's original collapsed bladder diagnosis documents |
| 70-73 | Photos of catheter, catheter box, instructions, and antibiotic ointment |
| 74 | Bisi Hadaway signature |
| 75 | July 4, 2022, detailed nursing note |
| 76 | Wexford Director of Nursing Position summary |
| 77 | July 5, 2022, detailed nursing note |
| 78 (pp. 1-9) | Photographs of Plaintiff's handwritten notes on pages of his calendar |
| 79 | December 2, 2022, call pass |
| 80-82 | IDOC Administrative Directives on contractual employees, overtime, and bloodborne pathogens |
| CD re Doc. 81 | Defendants Steadman, Mason, Rice, and Martin |
| Exhibit No. | Description |
| 1-10 | Exhibits 1-10 on the CD re Doc. 81 are the same as exhibits 1-10 on the CD re Doc. 69 |
| 11 (pp. 1-17) | Various call passes with handwritten notes.  All the same as CD re Doc. 69, other than page 8, which contains a handwritten note about Defendant Mason |

| 12 (pp. 1-6) | Request forms with handwritten notes, all previously included with CD re Doc. 69 |
| 13 | Segregation sick call rounds chart, this is an undated document which Plaintiff attributes to June 3, 2022, in his response to Defendant Rice |
| 14-20 | Nurse treatment line logs (same as Exhibits 13-20 of CD re Doc. 69) |
| 21 (pp. 1-10) | Detailed nursing notes from various dates |
| 22 (pp. 1-6) | Excerpt of detailed nursing notes from Plaintiff's stay in the prison infirmary for cellulitis |
| 23-29 | Provisions of Illinois state statutes concerning nursing and negligence |
| 30-38 | Excerpts of the Illinois Administrative Code |
| 39-44 | Excerpts of the IDOC Administrative Directives |
| 45-48 | Articles on cathetering |
| 49 | Article about emotional distress with no clear source |
| 50-58 | Prison medical intake forms, transfer summaries and medical permits |
| 59-60 | There are no exhibits associated with these numbers on this disk |
| 61 (pp.1-8) | Excerpts of the Robinson orientation manual |
| 62-68 | Materials on nursing ethics and standard of care |
| 69 (pp. 1-4) | Original bladder diagnosis docs |
| 70-73 | Photographs of catheter, catheter box, instructions, and antibiotic ointment |
| 74 | There is no exhibit associated with this number |
| 75 | Article concerning the standard of care for pretrial detainees |
| 76-77 | Wexford position summaries for Director of Nursing and Healthcare Administrator |
| 78 (pp. 2-8) | Handwritten notes on Plaintiff's calendar, there was no page 1 included in this CD |
| **CD re Doc. 104** | **Defendant Switzer** |
| **Exhibit No.** | **Description** |
| 1 (pp. 1-8) | Grievance documentation re March 27, 2022, catheter shortage & May 16, 2022 jelly lubricant shortage (same as exhibit 1 on CDs re Docs. 69 and 81) |
| 2 (pp. 1-4) | September 16, 2022, grievance documents requesting red box in bubble for catheter disposal, August 28, 2022, issue with Stephens/Williams and objection to catheter exchange rule (same as exhibit 2 on CDs re Docs. 69 and 81) |
| 3 | Handwritten notes on March 21, 2022, treatment line call pass |
| 4 | Handwritten document by Plaintiff that he alleges he attempted to get the nurses to sign at nurse treatment line on March 28, 2022, concerning their alleged instructions given to reuse catheters |
| 5 | Nurse treatment line flow sheet covering March 2022-April 2022 |
| 6-11 | Provisions of Illinois state statutes concerning nursing and negligence |
| 12-20 | Excerpts of the Illinois Administrative Code |
| 21-25 | Excerpts of the IDOC Administrative Directives |
| 26-29 | Articles about cathetering |
| 30 | Article about emotional distress with no clear source |
| 31-35 | Prison intake, transfer summary, and medical history documents |
| 36-42 | Materials on nursing ethics and the standard of care |
| 43 (pp. 1-4) | Original collapsed bladder diagnosis documents |
| 44-46 | Pictures of catheter box and supplies |
| 47 | Plaintiff's handwritten calendar notes from March 2022 |
| 48 (pp. 1-2) | Defendant Switzer's timecard (same as Switzer's Exh. 104-2) |
| 49-50 | IDOC Administrative Directives on time of contractual employees and overtime |